UNITED STATES of America, for the Use and Benefit of ROBERT DeFILIPPIS CRANE SERVICE, INC.

v.

WILLIAM L. CROW CONSTRUCTION COMPANY, Crow Construction Company and/or Crow Construction Co., Inc. and the Aetna Casualty & Surety Company.

No. 90 CV 1875.

United States District Court, E.D. New York.

July 15, 1993.

Max E. Greenberg, Cantor, Trager & Toplitz, New York City (Leonard Shabasson, of counsel), for plaintiff.

M. Carl Levine Morgulas & Foreman, New York City (Jerrold Morgulas, of counsel), for defendants.

## MEMORANDUM AND ORDER

NICKERSON, District Judge:

Use plaintiff, Robert DeFilippis Crane Service, Inc. ("plaintiff"), brought this action under the Miller Act, 40 U.S.C. §§ 270a–d, against defendants William L. Crow Construction Company ("Crow"), the prime contractor at two construction projects at the United States Naval Station, Staten Island, New York, and The Aetna Casualty & Surety Company ("Aetna"). Aetna is the surety on payment bonds for the benefit of persons supplying labor and materials to subcontractors at the two projects.

Plaintiff seeks payment of $279,500.41 under the bonds, saying that it has not been paid for equipment it rented to the Double–R Construction Corporation ("Double–R") (now bankrupt), a subcontractor performing work on the projects between March 1988 and June 1989.

Plaintiff moves and defendants cross-move for summary judgment.

### I.

The disputed and undisputed facts necessary to understand these motions are as follows.

### A.

Crow was the prime contractor on two projects, known familiarly as "SIMA" and "Utilities," at the Staten Island naval station. Aetna provided separate payment bonds for each project. Double–R was a subcontractor. Plaintiff, having no contractual relations with Crow, provided equipment to Double–R for use at the projects.

### 1. The relationship between Double–R and plaintiff

The nature of the agreement between Double–R and plaintiff for the rental of equipment is in dispute. Plaintiff says that it "rented" the equipment to Double–R between March 23, 1988 and June 23, 1989 under a verbal agreement and periodically sent invoices to Double–R totalling $279,500.41.

For nearly a year and a half Double–R made no payment to plaintiff for this allegedly rented equipment. Robert DeFilippis, the sole proprietor of plaintiff, says Robert Sisto, the principal of Double–R, assured him that Crow owed a large retainage to Double–R and that Double–R would pay plaintiff when Double–R was paid. DeFilippis also says he was not worried because he was assured of payment under the Miller Act bond if Double–R defaulted.

Defendants question whether plaintiff "rented" the equipment to Double–R. They point out that after Double–R filed for protection under the bankruptcy laws on May 22, 1989, the bankruptcy trustee found no invoices or written requests for payment from plaintiff. But the trustee did find invoices from almost every other purported creditor. After Double–R petitioned under Chapter 11, plaintiff claimed it was owed $1.62 million for equipment rentals.

Defendants suggest that DeFilippis was Sisto's silent partner in Double–R, providing equipment in exchange for equity, and that once Double–R filed for bankruptcy protection, DeFilippis recharacterized the transaction as equipment rental.

Defendants say, for example, that on at least one occasion Sisto represented to another subcontractor, in front of DeFilippis, that Sisto and DeFilippis were the two "R"'s of "Double–R." Plaintiff urges the court to treat evidence of this as hearsay. But such

testimony would be significant because DeFilippis did not contradict Sisto. Defendants also provide evidence tending to show that plaintiff's bookkeeper reported that DeFilippis was the Vice President of Double–R.

DeFilippis concedes that (1) on several occasions he used his personal credit to enable Double–R to obtain surety bonds on projects for which plaintiff would provide heavy equipment; (2) he allowed Double–R to incur a $1.62 million debt for "rental" of plaintiff's equipment without once making a written request for payment; and (3) he loaned Sisto money when Sisto became sick and fell into arrears on his mortgage after Double–R's bankruptcy.

DeFilippis contends that he had only a personal and business relationship with Sisto but no direct or indirect interest in Double–R.

### 2. Representations by Double–R and DeFilippis to Crow

During the term of the SIMA and Utilities subcontracts Double–R submitted to Crow six monthly requisition forms listing, under oath, the names of all suppliers and amounts due. At no time did Double–R suggest that plaintiff had rented equipment or was owed any funds.

On May 25, 1989, three days after Double–R filed its bankruptcy petition, a meeting was held at Crow's offices to determine whether Double–R could function sufficiently to complete various subcontracts. The meeting was attended by:

Bernard Monahan (vice president of Crow)

Edwin Efros, Esq. (counsel for Crow)

James P. Pagano (bankruptcy attorney for Double–R)

Ben Lewis, Esq. (corporate counsel for Double–R)

Robert Sisto (principal of Double–R)

Bill Kiecka (employee of Double–R)

Robert DeFilippis

Efros describes the meeting as follows. Sisto and DeFilippis arrived together. One of them signed both names on the attendance sheet. The two took turns assuring others present that Double–R could complete the work with some financial help from Crow on current billings. DeFilippis, by his conduct and statements, gave the impression that he was a partner or financial backer of Double–R. One of the pressing subjects of discussion was the extent of Double–R's existing obligations to subcontractors and suppliers. A number of these obligations were discussed, but at no time did DeFilippis reveal or suggest that Double–R owed plaintiff a large sum, indeed more than $250,000, for equipment provided for the projects. DeFilippis and Sisto promised personally to provide $50,000 in cash to pay then-due obligations. In reliance on these representations Crow agreed to advance $400,000 to Double–R for current expenses.

DeFilippis provides a somewhat different account of the meeting. He says that he did not hold himself out as representing Double–R, never offered to provide $50,000 for then-due obligations, and attended solely to learn whether Crow would make a payment to Double–R, enabling it to pay plaintiff for rent owed. He does not deny that Crow sought to determine the extent of Double–R's obligations on these projects and that he sat silent while Double–R's obligations, but not the debt owed plaintiff, were discussed. He asserts that had he been directly asked how much he was owed by Double–R, he would have answered truthfully and that, in the absence of a direct inquiry, he was free to remain silent while Sisto misrepresented Double–R's financial position.

### 3. Events after the May 25, 1989 meeting

After the meeting, Crow advanced $400,000 to a special Double–R account. Plaintiff says it continued to provide equipment to Double–R during June 1989 for use on both the SIMA and Utilities projects. Defendants dispute this. On June 23, 1989 Sisto was hospitalized for a "psychotic depressive" disorder; Double–R withdrew from the project; and DeFilippis thereafter acted as spokesperson for the company.

Crow contracted with Tacoma Construction Company, headed by a former senior supervisor of Double–R and partly owned by DeFilippis, to complete the work originally subcontracted to Double–R. Defendants

have not been able to determine how the full $400,000 advance was disbursed.

On July 27, 1989 Double–R's Chapter 11 proceeding was converted into a Chapter 7 bankruptcy. Around September 6, 1989 plaintiff mailed and Crow received a notice of claim under the Miller Act.

### B.

If all ambiguities are resolved in favor of plaintiff, the facts may be summarized as follows.

Between March 23, 1988 and June 23, 1988 plaintiff rented equipment to Double–R for use at the two projects. While plaintiff purportedly issued and presumably mailed invoices to Double–R for each rental, it made no further written attempt to obtain payments that, by about June of 1988, amounted to more than $1.6 million (more than $250,000 for the two projects). DeFilippis, plaintiff's sole proprietor, was not concerned, thinking he could look for payment to the Miller Act bond in the event Double–R defaulted. Plaintiff did not notify Crow of the delinquency.

In May 1988, after Double–R sought protection under Chapter 11, DeFilippis attended a meeting with Sisto, principal of Double–R, at which the two gave Crow the impression, through words, acts, and omissions, that Double–R owed little or nothing to plaintiff. In reliance on those representations Crow advanced $400,000 for current expenses to allow Double–R to continue its work on the projects. Crow was harmed to an as-yet undetermined extent as a result.

Around September 6, 1990 plaintiff filed a notice of claim under the Miller Act for payment for rentals beginning on March 23, 1988. The claims are based on a series of invoices presumably reflecting agreements to rent specific pieces of equipment.

### II.

The Miller Act provides that, with certain exceptions not relevant here, the prime contractor of construction work on any public building or work exceeding $25,000 shall furnish a performance bond for the protection of the United States and a payment bond "for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract for the use of each such person." 40 U.S.C. § 270a(a).

Section 270b(a) provides, as a prerequisite to action on a payment bond, a written notice to the prime contractor. In pertinent part that section reads:

> any person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving written notice to said contractor within ninety days from the date on which such person did or performed the last of the labor or furnished or supplied the last of the material for which such claim is made ...

Plaintiff's papers urge that there is no issue of fact as to its right to $244,033.85 under the SIMA project bond and $35,466.49 under the Utilities project bond. Plaintiff argues that because it last provided equipment for both projects on June 23, 1989, its notice of claim mailed on September 6, 1989 relates back to all materials provided since March 23, 1988.

Defendants contend that (1) plaintiff did not own and therefore did not "supply" or "furnish" three pieces of equipment plaintiff says it rented to Double–R in mid June 1989 and that plaintiff's notice of claim is therefore untimely; (2) plaintiff did not supply equipment for use at the SIMA project after May 4, 1989 and that the notice with respect to that project is not timely; (3) the notice of claim is timely only with respect to contracts for equipment last supplied within 90 days of the notice date; and (4) plaintiff should be equitably estopped because, among other reasons, DeFilippis concealed from Crow Double–R's debt of $250,000 to plaintiff, thereby causing Crow to advance $400,000 to plaintiff.

Sections 270a and 270b(a) strike a balance. By allowing a person with a "direct contractual relationship" with a subcontractor to sue on the bond the statute protects and benefits those who have "furnished or supplied" materials for use on public projects.

But section 270b(a) also protects the prime contractor by requiring those who have no direct contractual relationship with the prime contractor but have "furnished or supplied" material to the project to provide timely notice of a subcontractor's non-payment. Without such notice, the prime contractor would have no ready means to determine the extent of its ultimate obligations. *See United States for the use of SGB Universal Builders Supply, Inc. v. Fidelity and Deposit Co.*, 475 F.Supp. 672, 674 (E.D.N.Y.1979).

### A. Whether plaintiff last "furnished or supplied" material within 90 days of giving written notice

The parties agree that on or about September 6, 1989 plaintiff mailed and Crow received notice as required under section 270b(a). The court therefore focuses first on whether, within the meaning of that section, plaintiff last "furnished or supplied" equipment on or after June 8, 1989 (that is, within 90 days of the notice) for use on either of the two projects.

Plaintiff contends it rented three pieces of construction equipment to Double–R between June 8 and June 23, 1989: (1) a Case 855, serial number 7500205, (2) a 950B Loader, serial number 22Z01970, and (3) a Case 580, serial number JJG0010525. The first two items were allegedly used on the SIMA project; the third item was allegedly used on the Utilities project.

The parties have introduced many documents addressed to whether or not plaintiff owned or had a right to collect rent for these items during June 1989.

Defendants submit a contract of sale showing on an attached schedule that plaintiff sold these items, together with 157 other pieces of construction equipment, to a Frank Santora on April 28, 1989 for $5 million and an assumption of existing debt by Santora of $4.8 million. While Santora was purportedly represented by counsel in this substantial transaction, the deal documents—many handwritten and amended by hand—are remarkably informal. At issue here is whether an unaltered schedule (which includes the three disputed pieces of equipment) attached to the contract of sale accurately lists the equipment acquired by Santora.

In separate depositions, plaintiff's dispatcher and one of plaintiff's former employees state that the unaltered version of the schedule lists the pieces acquired by Santora. Moreover, an insurance binder for Santora Crane Service, Inc. ("Santora Crane") indicates that the 950B Loader and the Case 580 were owned and insured by Santora Crane and that the Case 855 was owned but not insured by Santora Crane. When that company filed for bankruptcy in June 3, 1992, it listed the Case 855 as an asset.

Plaintiff says that while it sold most of its equipment to Santora, it did not sell approximately 10 pieces, including the three in dispute. In support of this assertion, it submits, among other items, (1) affidavits in which DeFilippis and his bookkeeper swear that these 10 pieces of equipment were not sold to Santora; (2) an affidavit of plaintiff's accountant stating that certain unidentified pieces of equipment, originally to been sold to Santora, were not transferred to him; (3) a marked-up version of the schedule of equipment sold to Santora, indicating that certain pieces of equipment (including the three disputed pieces) had not been sold; (4) an unlabelled sheet of paper listing the 10 pieces; (5) an insurance report indicating that about 10 unidentified pieces of equipment had not been sold to Santora; and (6) evidence that plaintiff registered the Case 580 with New York State on December 4, 1989.

DeFilippis points out that the dispatcher deposed by defendants had indicated he received a list so that he could distinguish plaintiff's equipment from Santora's equipment. Such a list would be unnecessary, he says, if Santora bought every piece of equipment previously owned by plaintiff.

DeFilippis says he traded the 950B Loader in August 1990 to the Pile Foundation Co., Inc. ("Pile") in exchange for work done by Pile (he provides an invoice from Pile for $107,403.95, but no documentation of a sale to or trade with Pile). He says he also traded the Case 855 to a corporation wholly-owned by his children (he offers a "Bill of Sale" issued by plaintiff purportedly showing

the sale); he says that corporation sold the Case 855 to Santora Crane on June 19, 1992. (This last transaction is curious as Santora Crane was then in bankruptcy; any equipment purchase would have required bankruptcy court approval; and such approval was neither granted nor sought.) As for the Case 580, DeFilippis submits evidence that he filed an insurance claim for its alleged theft on September 6, 1990.

Both parties have sought to analyze and interpret notations in the yard logs of plaintiff and Santora Crane. The court finds the notations inconclusive.

■ There is a genuine issue as to whether, in June 1989, plaintiff owned or had a right to collect rent for the three disputed pieces of equipment. Most of plaintiff's evidence is in the form of slips of paper and receipts that it generated or affidavits from people over whom it exercised considerable influence. Plaintiff provides virtually no contemporaneous independent evidence that it owned these pieces.

Defendants' evidence consists primarily of the schedule of equipment sold to Santora and the Santora Crane insurance binder and is independent and contemporaneous. But neither party's evidence is sufficient to establish conclusively that plaintiff could or could not have supplied any of these pieces of equipment in June 1989. This court cannot determine precisely which equipment, if any, was retained by plaintiff. Summary judgment for either party on this ground is thus unjustified.

B. Whether plaintiff has a claim for equipment allegedly rented to Double–R in June 1989 for use on the SIMA project

Defendants say that even if plaintiff rented to Double–R the Case 855 and the 950B Loader referred to above as late as June 8, 1989, they were never used on either project in June 1989.

Plaintiff has submitted a log indicating that the Case 855 and the 950B Loader were used on the SIMA project until the period ending June 23, 1989. In contrast, defendants submit the affidavits of an Allen Kas-, den, Senior Vice–President of Crow, and Bernard Monahan, Vice–President of Crow, stating that these pieces were not used at either project in June 1989.

The Crow officials explain that SIMA project daily reports identify each subcontractor, the nature of the work done, the number and classification of the workmen involved, and the hours worked. Kasden says those reports do not indicate the presence of any operating engineers or use of a loader after May 4, 1989. During June Double–R was reportedly working only with laborers, carpenters, and lathers; it was not performing work requiring a loader. Monahan reports that periodic color photographs taken at the site reveal no heavy equipment between May 4 and June 23, 1988.

Defendants' analysis, even if correct, is incomplete. Plaintiff's invoices show that it also rented a Case 855 to Double–R for the SIMA project between June 1 and June 23, 1989. The photographs described by Monahan do not alone resolve all ambiguities.

■ The parties submit purportedly accurate but contradictory records. Moreover, even if the equipment was not used at the naval station, plaintiff could still make a Miller Act claim if, in good faith, it had reason to believe the equipment was to be used at the projects. *See United States for the use and benefit of Carlson v. Continental Casualty Co.,* 414 F.2d 431, 433 (5th Cir.1969).

There is an issue of fact on this matter, making partial summary judgment unjustified on this ground.

C. Whether plaintiff's "claim" relates back to equipment first rented on March 23, 1988

Defendants say that the "contractual relationship" within the meaning of section 270b(a), between plaintiff and Double–R, was based not on some master agreement but on individual contracts represented by invoices covering pieces of equipment and that plaintiff was required to give notice within 90 days from the date the "last" of the equipment called for in an invoice was furnished or supplied.

Plaintiff says that "there was an overall agreement that [plaintiff] would rent all the equipment necessary for Double–R to use" on the prime contract, and that the claim relates back to the equipment first rented on March 23, 1988.

### 1.

■ Section 270b(a) provides that a supplier with a "direct contractual relationship" with a subcontractor must give written notice to the prime contractor within 90 days from the date on which the supplier "supplied the last of the material for which such claim is made." Thus in every instance a supplier must base its "claim" on some underlying contract, whether established in a telephone call or in a formal document.

■ If, for example, a construction equipment supplier enters into 10 contracts with a subcontractor to rent equipment for a public construction project over a five year period and receives no payment on the first contract, the court reads section 270b(a) to mean that the supplier would then have a "claim." If, in this example, the supplier last furnished equipment required under the first contract on January 1, 1993, then section 270b(a) gives the supplier 90 days from that date in which to present its notice of claim. The supplier could not present its notice of claim based on this contract more than four and a half years later, even if the supplier continued to furnish equipment to the same subcontractor under subsequent contracts.

This reading gives effect to the structure and purposes of the Miller Act. Section 270a and 270b balance the interests of suppliers and laborers (who could be devastated by a subcontractor's failure to pay wages and bills) and those of the prime contractors (who otherwise would have had inadequate means of monitoring payments to laborers and suppliers with whom it had no contractual relationship). If the prime contractor receives notice of non-payment it can then protect itself from escalating undisclosed claims. But it can also protect the suppliers by, if necessary, increasing the retainage or making checks co-payable to subcontractors and suppliers.

### 2.

Courts have not interpreted the statute in a consistent manner. The Second Circuit long ago acknowledged but did not decide the question. Courts within this circuit (and elsewhere) have taken diverging courses.

In *United States for the use of J.A. Edwards & Co. v. Peter Reiss Constr. Co.*, 273 F.2d 880 (2d Cir.1959), *cert. denied*, 362 U.S. 951, 80 S.Ct. 864, 4 L.Ed.2d 869 (1960), the Second Circuit held that a notice of claim does not relate back to a series of orders where the last order was placed more than 90 days after the prior seven orders. That court explicitly distinguished between a circumstance in which the supplier provides materials pursuant to a master agreement and one in which it provided materials pursuant to discrete contracts. But it left undecided the question of whether the notice relates back to the first in a series of discreet orders in the absence of a 90–day gap.

In *United States for the use of J.A. Edwards & Co. v. Bregman Constr. Co.*, 172 F.Supp. 517, 522 (E.D.N.Y.1959), a court within this district held that even when materials are furnished pursuant to a series of separate contracts, the measuring date for purposes of the notice of claim "will be the date when the last material is furnished under the last contract." The court reasoned that, otherwise, unpaid day-to-day laborers would have to file notices every day after they had not been paid for more than 90 days and that the prime contractor would be flooded with 90–day notices. The Fourth Circuit adopted this reasoning soon thereafter. *Noland Co. v. Allied Contractors, Inc.*, 273 F.2d 917 (4th Cir.1959).

But in *United States for the use of I. Burack, Inc. v. Sovereign Constr. Co.*, 338 F.Supp. 657, 661 (S.D.N.Y.1972), another court within this circuit reached an opposite result. It held that, where material had been provided pursuant to a series of purchase orders, a claim for material not delivered within 90 days of the date of notice of claim is barred by the notice proviso, even if no gap of 90 days exists between successive deliveries.

That court explained that while the Miller Act is generally designed to protect the supplier against defaults in payment for materials, the notice proviso is for the benefit of the prime contractor. Only if the prime contractor receives notice of the failure of its subcontractor to pay can it protect itself from claims by suppliers by withholding appropriate amounts.

The rulings in the *Peter Reiss Constr. Co.* and *Sovereign Constr. Co.* cases were more recently adopted in *United States for the use of A & M Petroleum, Inc. v. Sante Fe Eng., Inc.*, 660 F.Supp. 1111, 1114 (S.D.Miss.1987). There the court construed the notice provision of section 270b(a) as barring claims on individual purchase agreements where the supplier fails to notify the primary contractor that a subcontractor is not making payments on an open account within 90 days of each delivery. As that court explained:

> The general contractor should expect that any supplier who provides labor or material to a subcontractor covered under the Miller Act on an open account or credit basis bills the subcontractor on a regular basis. Once the supplier sees that the subcontractor cannot or will not keep his account current, a demand letter or notice to the general contractor should be issued ... The Miller Act was not intended to serve as a license for suppliers to act in a manner contrary to contemporary business practices and to their own detriment ... It would be inequitable to construe Section 270b(a) to condone injudicious and indolent business practices on the part of suppliers who undertake to deal with Miller Act subcontractors on an open account basis.

*Id.*

This case was reversed by the Fifth Circuit. 822 F.2d 547 (5th Cir.1987). In a summary opinion that did not examine the statutory language, the statutory purpose, or the legislative history, that court held that a Miller Act notice of claim related back to the first delivery of materials, without regard to whether the materials were delivered pursuant to a single or series of contracts.

In support of its conclusion the Fifth Circuit cited *United States for the use of Westinghouse Elec. Supply Co. v. Endebrock–White Co.*, 275 F.2d 57 (4th Cir.1960), a case that involved a single delivery of material, and seemingly placed substantial reliance on *Timeliness of notice to public works contractors on federal project, of indebtedness for labor of materials furnished,* 69 A.L.R.Fed 600, 620–24 (1984), an annotation that described *Sovereign Construction Co., supra,* as adopting a ruling quite the opposite of the one made. Under the circumstances this court declines to follow the Fifth Circuit.

This court concludes that a "claim" made under the Miller Act must be made pursuant to an underlying contract and that the supplier must present a claim within 90 days after "the last of the material" is supplied under that contract. Where claims are based on a series of contracts, a claim must be made within 90 days from the date on which the supplier "furnished or supplied the last of the material" for each underlying contract.

3.

█ As noted above, plaintiff asserts that "there was an overall agreement" to rent all the equipment necessary for Double–R to use on the two projects.

But plaintiff adduced nothing resembling an enforceable contract that could form the basis for a claim under the Miller Act. De-Filippis instead explained that his usual business practice was to wait until a customer ordered a specific piece of equipment by telephone. If the equipment was available he would then supply it according to terms that, presumably, would change from time to time. Those agreements were apparently memorialized by an invoice that, he says, was prepared and sent to the renter.

Insofar as plaintiff presents a cognizable claim under the Miller Act, it is based upon separate agreements evidenced by invoices purportedly indicating that specific items of equipment were rented to Double–R under specific terms on specific dates.

Each of these invoices was for a substantial amount, generally ranging from $2,000 to $19,000 and averaging about $6,000. Some of the invoices, considered together, appear to reflect agreements to rent specific items of

equipment for several months, at an aggregate cost of nearly $50,000.

Plaintiff would have a claim based on each cognizable agreement to rent individual items of equipment (if indeed plaintiff supplied the equipment as a "rental" and not under some other understanding, such as a business partner's contribution). Thus, plaintiff's notice of claims is timely only insofar as it is based on the individual agreements to rent those items of equipment—the Case 580, Case 855, and 950B Loader—last furnished or supplied on or after June 8, 1989.

### D. Whether plaintiff may be equitably estopped

Defendants' contend, last, that plaintiff should be equitably estopped from presenting its entire claim.

■ The doctrine of equitable estoppel is designed "to ensure fairness in the relationship between parties." *Konstantinidis v. Chen,* 626 F.2d 933, 937 (D.C.Cir.1980). It " 'precludes a litigant from asserting a claim or defense that might otherwise be available to him against another party who has detrimentally altered his position in reliance on the former's misrepresentation or failure to disclose some material facts.' " *United States for the use of Krupp Steel Prod., Inc. v. Aetna Ins. Co.,* 923 F.2d 1521, 1526 (11th Cir.1991) (citation omitted) (Miller Act case).

■ Estoppel requires the presence of three elements: "(1) words, acts, conduct or acquiescence causing another to believe in the existence of a certain state of things; (2) wilfulness or negligence with regard to the acts, conduct or acquiescence; and (3) detrimental reliance by the other party upon the state of things so indicated." *Id.* Because the prime contractor must take reasonable steps to protect itself from a possible misapplication of funds, its detrimental reliance must be reasonable. *Id.*

■ Applying the doctrine to this setting, the court concludes that a supplier may not knowingly or intentionally take steps to conceal from the prime contractor the extent of a subcontractor's delinquent obligations, thereby induce the prime contractor to make a significant advance to allow the project to continue, then later demand payment on the concealed obligation. To the extent the prime contractor suffers a loss due to the deception, the supplier's claim should be reduced. *See United States for the use and benefit of Gulfport Piping Co. v. Monaco and Sons, Inc.,* 336 F.2d 636, 639 (4th Cir.1964) ("When the Miller Act claimant by his own agreement or representation induces the general contractor to make payment to another, he is estopped from subsequent assertion of his claim to the extent that it is duplicating.").

■ Defendants submit evidence showing that DeFilippis was very close to (if not a principal of) Double–R and that, from the outset, he failed to inform Crow of Double–R's increasing obligations to plaintiff. But the evidence, with all ambiguities resolved in favor of plaintiff, does not show that prior to May 25, 1989 DeFilippis misled (or knew that Double–R had misled) Crow with respect to these obligations.

DeFilippis's professed ignorance and innocence plainly ended by May 25, 1989. At a meeting on that date, by his words, actions, and omissions, DeFilippis led Crow to believe that Double–R did not owe plaintiff a substantial sum. DeFilippis's assertion that—if directly asked how much Double–R owed plaintiff he would have answered truthfully—is insufficient to rebut the sworn statement of Crow's counsel that Crow attempted fully to discover Double–R's obligations under the subcontracts and that DeFilippis said nothing about the debt owed to plaintiff.

In reasonable reliance on representations by Sisto and DeFilippis, Crow agreed to advance $400,000 for payment of current obligations. Crow credibly says it would not have advanced the $400,000 had it known of the large sum owed plaintiff. Had that obligation been revealed, Crow would have immediately recognized that plaintiff had been submitting fraudulent monthly requisitions. Crow hardly would have entrusted funds to a dishonest subcontractor.

The extent of the loss is not clear from the papers. Plaintiff may be correct that some of the $400,000 advance was used to pay creditors who, otherwise, would have had a

claim on the Miller Act bond. Defendants report (and plaintiff does not dispute) that $168,655 of this $400,000 was transferred to an escrow account in National Westminster Bank and that the ultimate disposition is not known.

The court holds that, without regard to the issue of timely notice, plaintiff's claim of $279,500.41 should be reduced to the extent that defendants suffered a loss attributable to the $400,000 advance.

To the extent this issue requires the court to determine how Double–R disbursed the $400,000 advance, the court will consider argument that the burden of production on that question should be shifted to plaintiff, notwithstanding the usual rule that a party asserting an affirmative defense bears the burdens of production and proof. Such a partial shifting of the burden may be justified here because plaintiff appears to be in a strong position, given its intimate relationship with Double–R, to determine how Double–R spent the advance.

### III.

Plaintiff's summary judgment motion is denied.

Defendants' summary judgment motion is granted in part. Plaintiff may recover the lower of (1) claims based on individual rental agreements, if any, for specific items of equipment last furnished or supplied on or after June 8, 1989, or (2) plaintiff's total claim less the amount of defendants' injury attributable to Crow's decision to advance $400,000 to Double–R.

So ordered.