USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 97-1577 UNITED STATES OF AMERICA FOR THE USE AND, BENEFIT OF WATER WORKS SUPPLY CORPORATION, Plaintiff, Appellee, v. GEORGE HYMAN CONSTRUCTION COMPANY, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, P.A., FEDERAL INSURANCE COMPANY AND SEABOARD SURETY COMPANY, Defendants, Appellants. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Patti B. Saris, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Campbell, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ ____________________ Steven J. Comen, with whom Jeremy M. Sternberg, Dori C. ________________ ____________________ ________ Gouin, Howard J. Hirsch and Goodwin, Procter & Hoar LLP were on _____ ________________ ____________________________ brief for appellant, The George Hyman Construction Company. Bert J. Capone, with whom CharCretia V. DiBartolo and _______________ _________________________ Cetrulo & Capone were on brief for appellant, National Union Fire ________________ Insurance Company of Pittsburgh, PA; Federal Insurance Company and Seaboard Surety Company. Gary H. Kreppel for appellee. _______________ ____________________ December 10, 1997 ____________________ CAMPBELL, Senior Circuit Judge. Defendant- _______________________ appellant George Hyman Construction Company ("Hyman") appeals from the district court's judgment awarding recovery to the Water Works Supply Corporation ("Water Works") under the Miller Act, 40 U.S.C. 270a-270d (1986) (the "Miller Act" or the "Act"). Hyman makes a number of arguments as to why the district court erred in allowing recovery. In this opinion we concentrate particularly on Hyman's contentions: (1) that Water Works did not satisfy the Act's ninety-day notice requirement; and (2) that Water Works did not have a sufficiently close relationship to Hyman to qualify for recovery under the Miller Act. Finding no merit in these or in the other arguments that Hyman advances, we affirm. I. BACKGROUND. The facts are largely undisputed. Hyman was the general contractor on a $70 million federal construction project to build a mail processing center in Waltham, Massachusetts (the "Post Office Project" or the "Project"). Pursuant to the requirements of the Miller Act, Hyman obtained a payment bond from National Union Fire Insurance Company of Pittsburgh, PA, Federal Insurance Company, and Seaboard Surety Company (collectively, the "Sureties"). On or about September 16, 1994, Hyman entered into an oral agreement with Calvesco, Inc. ("Calvesco"), wherein Calvesco -2- promised to serve as demolition, excavation and site work subcontractor for the Post Office Project. On September 16, 1994, the same day that Hyman hired Calvesco, Calvesco submitted an application for credit to Water Works, a purveyor of pipe and piping materials. Water Works extended an unlimited line of credit to Calvesco. Calvesco was working on at least three projects at that time, and the credit application did not indicate whether it was for a particular project. Subsequently, Calvesco informed Hyman that it could not legally serve as subcontractor on the Post Office Project because it was a non-union shop. On September 27, 1994, Hyman and Calvesco agreed to replace Calvesco with Iron Holdings, Inc. d/b/a Charles A. Jackson Co. ("Jackson"), a unionized company created by the principals of Calvesco.  On October 11, 1994, Jackson notified Water Works that it had replaced Calvesco as subcontractor on the Post Office Project. Jackson requested that it, rather than Calvesco, receive Water Works's invoices. Because Water Works had extended credit only to Calvesco and not to Jackson, Water Works refused to supply Jackson unless Calvesco executed a corporate guarantee. Until the corporate guarantee could be signed, Water Works agreed to ship piping materials to the Post Office Project site at Jackson's request and to send the invoices to Calvesco. That same day, -3- Jackson placed an order for pipe. Water Works shipped the material to "Charles A. Jackson Co., c/o Calvesco." Water Works sent the invoice to "Calvesco, Inc. Attn: Jackson Gateman, Treas." ("Gateman"). From early October through December 29, 1994, Water Works filled seven purchase orders relating to the Post Office Project. Water Works continued to ship materials to the Post Office Project site and to send the invoices to Gateman at Calvesco. Jackson paid for five of the seven shipments; the other two invoices remain unpaid and are the subject of this action. The first unpaid invoice, for $53,493.83 and dated November 30, 1994, corresponded to an order placed on November 1, 1994 by Lou Ingegneri, the Post Office Project manager for Jackson. The second unpaid invoice, for $157.76 and dated January 12, 1995, related to the last delivery made by Water Works to the Project, which occurred on December 29, 1994. This second invoice does not indicate the name of the person placing the order. During January and February of 1995, Water Works's credit manager Stanley Wernick ("Wernick") conversed on the telephone with several employees of Hyman about the outstanding November and December invoices. On March 7, Wernick sent a demand letter to Calvesco. Wernick also sent a copy of this letter to Hyman and the Sureties. Hyman responded to Wernick's communications in writing on March 22 -4- by indicating that it had turned the matter over to its attorneys and was not paying any claims until it had a clear picture of its options. On April 5, 1995, Water Works filed suit in Middlesex County Superior Court against Calvesco and its personal guarantor for monies owed on several jobs, including the Post Office Project. This state court suit resulted in a settlement in which Calvesco agreed to pay Water Works for the cost of its materials. Calvesco has not satisfied this judgment. On the same day that Water Works filed its state action, it also filed a one-count Miller Act complaint against Hyman and the Sureties in the United States District Court for the District of Massachusetts. The district court consolidated Water Works's federal action with twenty-five other actions brought against Hyman arising from the Post Office Project in order to determine issues of fact and law common to all the claimants. The district court found that Calvesco and Jackson were separate corporate entities, and that Calvesco was Hyman's subcontractor from September 16, 1994 through September 27, 1994, with Jackson serving as subcontractor thereafter. Water Works argued to the district court that it was in a direct contractual relationship with Calvesco during the period of time when Calvesco was Hyman's direct -5- subcontractor. The district court rejected this argument, finding that the credit application between Water Works and Calvesco did not constitute a contract. Nevertheless, the court held that Water Works could recover under the Miller Act. Finding that Water Works had satisfied the 90-day notice requirement in the Miller Act, the court held that Water Works could recover from the payment bond on the amount owed for its November order under two alternative theories. First, Jackson had an open account with Water Works. Second, Water Works could recover under the doctrine of quantum meruit. The district court allowed Water Works to recover the amount of its November shipment -- $53,493.83, plus costs and interest -- but not the amount of its December shipment - - $157.76. The key distinction between the two orders, in the court's view, was that the November order was signed by Jackson's project manager, whereas the December order, being unsigned, could not be plainly attributed to Jackson. II. STANDARD OF REVIEW. We review de novo questions of statutory __ ____ interpretation that present pure questions of law. See Riva ___ ____ v. Commissioner of Mass., 61 F.3d 1003, 1007 (1st Cir. 1995). _____________________ The sufficiency of notice under the Miller Act, to the extent based on undisputed facts, is commonly reviewed de novo. __ ____ -6- See United States ex rel. Consol. Elec. Distribs., Inc. v. ___ ______________________________________________________ Altech, Inc., 929 F.2d 1089, 1092 (5th Cir. 1991); United ____________ ______ States ex rel. Moody v. American Ins. Co., 835 F.2d 745, 748 ____________________ _________________ (10th Cir. 1987). We uphold a district court's factual findings unless they are clearly erroneous. See Fed. R. Civ. ___ P. 52(a); United States ex rel. Calderon & Oyarzun, Inc. v. ________________________________________________ MSI Corp., 408 F.2d 1348, 1348 (1st Cir. 1969). _________ III. DISCUSSION. A. The Statutory Scheme of the Miller Act. ______________________________________ The Miller Act requires a general contractor performing a contract valued at over $25,000 on any public construction project to obtain a performance bond for the protection of persons supplying labor and material in the prosecution of the work on the project. See 40 U.S.C.  ___ 270a(a)(2). The Act provides that persons who have "furnished labor or material" to a public project may sue to recover from the payment bond any amount owed to them. Id. ___ 270b(a). The purpose of the Miller Act is "to protect persons supplying labor and material for the construction of federal public buildings in lieu of the protection they might receive under state statutes with respect to the construction of nonfederal buildings." United States ex rel. Sherman v. ______________________________ Carter, 353 U.S. 210, 216 (1957); see also United States ex ______ ___ ____ ________________ -7- rel. Pittsburgh Tank & Tower, Inc. v. G&C Enters., Inc., 62 ___________________________________ __________________ F.3d 35, 35 (1st Cir. 1995) (same). Courts give the Act a liberal interpretation to achieve that purpose. See, e.g., _________ Carter, 353 U.S. at 216; Clifford F. MacEvoy Co. v. United ______ _______________________ ______ States ex rel. Calvin Tomkins Co., 322 U.S. 102, 107 (1944). _________________________________ Despite the "highly remedial" nature of the Act, MacEvoy, 322 U.S. at 107, there are two important limitations _______ on who can recover from the payment bond. First, the Miller Act allows recovery from the bond by persons who have a "direct contractual relationship" with either the general contractor or a first-tier subcontractor of the general contractor. 40 U.S.C. 270b(a). The Supreme Court has interpreted this provision to preclude recovery on the payment bond by anyone whose relationship to the general contractor is more remote than a second-tier subcontractor. See J.W. Bateson Co. v. United States ex rel. Bd. of Trustees ___ ________________ _____________________________________ of the Nat'l Automatic Sprinkler Indus. Pension Fund, 434 _______________________________________________________ U.S. 586, 590-91 (1977); MacEvoy, 322 U.S. at 107. _______ Second, the Act imposes a strict notice requirement upon suppliers who have a direct contractual relationship with a first-tier subcontractor, but no relationship with the general contractor. In order to recover from the payment bond, such suppliers must send written notice of their claim on the payment bond to the general contractor within ninety days from the date that they supply the last of the materials -8- for which they make a claim. 40 U.S.C. 270b(a); see also ___ ____ United States ex rel. John D. Ahern Co. v. J.F. White _____________________________________________ ___________ Contracting Co., 649 F.2d 29, 31 (1st Cir. 1981).1 _______________ B. Notice under the Miller Act. ___________________________ Fulfilling the Act's notice provision is a strict condition precedent to recovery by suppliers of first-tier subcontractors. See Ahern, 649 F.2d at 31. The notice ___ _____ provision serves an important purpose: it establishes a firm date after which the general contractor may pay its subcontractors without fear of further liability to the materialmen or suppliers of those subcontractors. See id.; ___ ___ Noland Co. v. Allied Contractors, Inc., 273 F.2d 917, 920-21 __________ ________________________ (4th Cir. 1959).  ____________________ 1. The relevant statutory language concerning notice reads as follows: Every person who has furnished labor or material in the prosecution of the work provided for [a federal project] . . . and who has not been paid in full therefor . . . shall have the right to sue on such payment bond . . . Provided, however, That any person ________ _______ having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving written notice to said contractor within ninety days from the date on which such person . . . furnished or supplied the last of the material for which such claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied. . . . Such notice shall be served by mailing the same by registered mail, postage prepaid, in an envelop addressed to the contractor . . . . 40 U.S.C. 270b(a). -9- 1. Substance of Water Work's Notice. ________________________________ While adherence to the notice requirement is mandatory, courts have allowed some informality in complying with the terms of the Miller Act regarding the method by which notice must be served. See, e.g., Fleisher Eng'g & __________ _________________ Constr. Co. v. United States ex rel. Hallenbeck, 311 U.S. 15, ___________ ________________________________ 18 (1940) (holding written notice sufficient although it was not sent via registered mail as statute provides); Coffee v. ______ United States ex rel. Gordon, 157 F.2d 968, 969 (5th Cir. ______________________________ 1946) (holding that a writing exhibited to the general contractor in the course of a discussion served as adequate notice under the Act). Courts have also been somewhat forgiving of deviations from the statutory requirement that the notice be in writing. See, e.g., Altech, 929 F.2d at __________ ______ 1092 (holding that the "only reasonable inference" from a meeting was that the subcontractor sought payment from the general contractor). The language of the Miller Act requires notice to the general contractor of the amount of the claim and name of the party to whom the material was furnished; it does not expressly require a demand that the general contractor pay. 40 U.S.C. 270b(a); see also McWaters & Bartlett v. United ___ ____ ____________________ ______ States ex rel. Wilson, 272 F.2d 291, 295 (10th Cir. 1959). ______________________ Nevertheless, courts have consistently, and we think correctly, held that "the written notice and accompanying -10- oral statements must inform the general contractor, expressly or impliedly, that the supplier is looking to the general contractor for payment so that it plainly appears that the nature and state of the indebtedness was brought home to the general contractor." United States ex rel. Kinlau Sheet _____________________________________ Metal Works, Inc. v. Great Am. Ins. Co., 537 F.2d 222, 223 __________________ ___________________ (5th Cir. 1976) (internal quotation marks omitted); see ___ also United States ex rel. Bailey v Freethy, 469 F.2d 1348, ____ _____________________________ _______ 1350-51 (9th Cir. 1972). Hyman argues that such notice as Water Works was shown to have provided to Hyman did not indicate that Water Works was looking to it for payment because the only "formal notice" that it received was a copy of Water Works's demand ____ letter to Calvesco. Hyman points to court decisions holding that the mere forwarding to the general contractor of a copy of a demand sent to a subcontractor does not satisfy the Miller Act's notice requirement. See Maccaferri Gabions, ___ ____________________ Inc. v. Dynateria, Inc., 91 F.3d 1431, 1437 (11th Cir. 1996) ____ _______________ (denying recovery under the Miller Act because sending to the general contractor a copy of a collection letter that was sent to the subcontractor, even when combined with a joint payment plan and invoices, was insufficient notice); United ______ States ex rel. Jinks Lumber Co. v. Federal Ins. Co., 452 F.2d _______________________________ ________________ 485, 488 (5th Cir. 1971).  -11- But while adequate notice requires bringing home to the general contractor that the supplier is looking to it for payment, courts have not required formalistic proof of this. Communications sent to the general contractor detailing the supplier's claim against the subcontractor may, for example, be supplemented by oral and other written exchanges if these make it unambiguously clear that the supplier is seeking payment from the general contractor. See Altech, 929 F.2d at ___ ______ 1093; Coffee, 157 F.2d at 970; Kinlau, 537 F.2d at 223. ______ ______ The record here shows not only that Water Works sent Hyman the amount and details of Water Works's claims against the subcontractor, but that these were accompanied by further oral and written communications that could only be perceived, and were in fact perceived, as looking to Hyman itself for payment. Water Works's credit manager, Wernick, initiated matters on February 3, 1995, by speaking on the telephone with two Hyman employees who were handling the Post Office Project account. During the course of several calls on that day, Wernick informed them that Water Works had not been paid by the subcontractor for its materials. Wernick thereupon faxed copies of Water Works's unpaid invoices and proofs of delivery to Hyman, thus informing Hyman of the amount Water Works claimed from the subcontractor. The district court found that, in these calls, Wernick also asked to obtain a copy of Hyman's payment bond for "the express -12- purpose of filing a bond claim." Hyman's personnel refused to release the requested bonding information, but, as the district court found, they countered with a promise that Hyman would issue joint checks payable to Jackson and Water Works, a device to ensure payment for Water Works's materials. Wernick continued to communicate about the unpaid claims with Hyman throughout the month of February. On February 9, Wernick spoke again with the same Hyman employees, who informed him that they were attempting to meet with the subcontractor to discuss the issue of the unpaid invoices. Finally on March 7, after more phone calls, Water Works sent to Hyman a copy of a demand letter it had written to Calvesco.2 The copy reflected at the bottom not only that a copy had gone to Hyman but that copies had been sent to Hyman's three Miller Act Sureties. Finally, on March 22, 1995, Hyman wrote Water Works thanking it for its patience, indicating that it had already paid Jackson, expressing its  ____________________ 2. Hyman argues that "the facts of the present case are even more persuasive than Maccaferri or Kinlau since Water Works __________ ______ purported demand letter . . . was not made to Hyman's ___ subcontractor Jackson, but rather to Calvesco." However, the names "Calvesco" and "Jackson" seem to have been used interchangeably on various occasions, and there is absolutely no evidence that Hyman was confused over the identity of the subcontractor identified by Water Works. Calvesco and Jackson were owned in common and Hyman had been a party to the agreement that substituted Jackson for Calvesco as subcontractor for the Project. While Hyman personnel, like Water Works, sometimes referred to "Calvesco," the name "Jackson" was correctly used by Hyman in its March 22 letter to Water Works declining to pay its claim, showing that Hyman was fully aware of thecorrect identity of the subcontractor.  -13- reluctance to pay the same bill twice, and informing Water Works that it had "turned the entire matter over to our attorneys and, on their advi[c]e, we are not paying anyone until we have a clear picture of our options." The above evidence provides clear indication that Hyman understood that Water Works was looking to it for payment, having received, as the district court found "actual notice." Wernick's initial request for a copy of the bond, following his faxing of the unpaid invoices and his telephone calls to Hyman about the debt, suggested that Water Works was looking to it for payment. Hyman's comprehension of this can be inferred from Hyman's promise to issue joint checks in substitute for information about the bond. But we need not decide whether these actions by themselves sufficed to constitute notice. Following these and other exchanges, Water Works sent Hyman on March 7 a copy of Water Works's demand upon the subcontractor. Unlike the copy in Maccaferri, this indicated at the bottom that copies were __________ also being sent to Hyman's three Sureties on the Miller Act bond, each of which was designated by name. It is not easy to think of a reason to notify the Sureties unless Water Works was looking to the bond for payment. In Maccaferri, the Eleventh Circuit held that __________ merely sending the general contractor a copy of the demand to the subcontractor did not suffice to show that the supplier -14- was looking for payment to the general, but the surrounding circumstances were far less indicative that payment was sought, and there was no indication that the Sureties were being sent copies. Here, upon receipt of a copy of Water Works's demand upon the subcontractor showing plainly that other copies had been sent to Hyman's Sureties, Hyman could have had no illusion that it was not being asked to pay. Hyman's letter of March 22, 1995 fully confirms our interpretation. In the letter, Hyman thanked Water Works "for being so patient with us while we are trying to sort out the problems" relative to the Jackson claims. The letter went on to speak of Hyman's difficulties with Jackson, Hyman's strong reluctance to pay the same bill twice, and that it had "turned the entire matter over to our attorneys and, on their advice, we are not paying anyone until we have _________________ a clear picture of our options" (emphasis added). "In the end," the letter went on, "we may, in fact, be held responsible for paying these invoices. But we will exhaust every legal remedy before we do." The district court inferred, and we entirely agree, that this letter must have been in response to what Hyman believed was a request for payment by Water Works. See Altech, 929 F.2d at 1093 ___ ______ (general contractor's letter held to provide evidence of notice).  -15- We, therefore, agree with the district court that in this period Hyman received notice sufficient to meet the requirements of the Miller Act. 2. Timing of Water Works's Notice. ______________________________ The district court found that the ninety-day period began to run on December 29, 1994, the day that Water Works made its final delivery of materials to the Post Office Project. Thus, by the court's calculations, Water Works's letter of March 7, 1995, a copy of which was sent to Hyman and the Sureties, and which in combination with the earlier invoices constituted the written portion of the notice, fit within the ninety-day limit. In support of its assertion that the court should have used the date of the November order, November 1, 1994, rather than the date of the December order when calculating the ninety-day time limit, Hyman suggests that each order under an open account represents a separate contract with an individual ninety-day limit. See United States ex rel. ___ _______________________ Robert DeFilippis Crane Serv., Inc. v. William L. Crow _______________________________________ _________________ Constr. Co., 826 F. Supp. 647, 655 (E.D.N.Y. 1993) _____________ (concluding that "[w]here claims are based on a series of contracts, a claim must be made within 90 days from the date on which the supplier 'furnished or supplied the last of the material' for each underlying contract"); United States ex _________________ rel. I. Burack, Inc. v. Sovereign Constr. Co., 338 F. Supp. ____________________ ______________________ -16- 657, 661 (S.D.N.Y. 1972). Under this reasoning, Hyman argues, the limit on the November order had run by the time that Water Works sent notice to Hyman. While several district courts have held that Miller Act notice runs from each order on an open contract, the weight of authority contradicts that position. See United ___ ______ States ex rel. A&M Petroleum, Inc. v. Santa Fe Eng'rs, Inc., __________________________________ ______________________ 822 F.2d 547 (5th Cir. 1987) (collecting cases from the Second, Fourth, and Tenth Circuits that have held, either implicitly or explicitly, that notice on an open account runs from the last delivery of materials); Noland, 273 F.2d at ______ 920-21. In Noland, the Fourth Circuit reasoned that, ______ although a strict reading might fulfill the purpose of the notice provision by offering more protection to the general contractor, the goal of a specific statutory provision must take a back seat to the purpose of the overall statute, which is to provide recovery for suppliers who have provided materials but not received compensation. See Noland, 273 ___ ______ F.2d at 920-21. We agree with the reasoning in Noland. Where ______ claims are based on an open account theory, the ninety-day notice period for all of the deliveries begins on the date of the last delivery to the project. The parties to this action agree that Water Works delivered the last of its materials to the Post Office Project on December 29, 1994. We therefore -17- conclude that the district court correctly refused to deny recovery on the November order merely because it was part of an open account. Hyman also argues that, since the district court denied recovery to Water Works for the December order of $157.76, it should not have used the date of that order for purposes of calculating the timeliness of notice. We are not persuaded. As an initial matter, we note that the statute states that the time limit runs from the date of the last delivery of material "for which a claim is made." 40 U.S.C. 270b(a). The statute does not start the time limit on the last claim for which the plaintiff eventually recovers; such a provision might prove unworkable. But even if the statute runs from the last recoverable claim, we see little problem. In denying Water Works recovery on the December order, the district court wrote a footnote explaining its reasoning for distinguishing between the November and December orders: the November order form contained the name of a Jackson employee while there was no name on the December order. The district court concluded that there was "no evidence as to whether Calvesco or Jackson placed the [December] order." Accordingly, the court limited Water Works's recovery to the amount of the November order ($53,493.83) plus costs and interest. -18- The undisputed facts are as follows. First, Water Works provided materials that were incorporated into the Post Office Project. Second, Water Works did not begin shipping these materials until after Jackson became the subcontractor on the Project. Third, although Water Works insisted upon sending its invoices to Calvesco, Jackson paid for the first five shipments by Water Works. Fourth, Calvesco was not a subcontractor on the Project during the time that Water Works shipped materials to the Project. Fifth, the last date that Water Works delivered materials to the Project was December 29, 1994. On these facts, we see no reason for the court to have questioned if Calvesco rather than Jackson placed the December order. Calvesco, having been replaced by Jackson as the subcontractor on the Post Office Project, had no reason to order materials for this job. The only reasonable inference is that Jackson placed this order, as it did earlier ones. While in the absence of a cross appeal, the court's denial of the $157.76 stands, we see no reason to reject the court's determination that the December 29, 1994 date triggered the notice period. As the notice was adequate and as the district court did not err in beginning the notice period from December 29, 1994, Water Works satisfied the notice requirements of the Miller Act. -19- C. Water Works's Relationship to Hyman. ___________________________________ In order to recover from the payment bond, a person must have a "direct contractual relationship" either with the general contractor or with a direct subcontractor. 40 U.S.C. 270b(a); see also Bateson, 434 U.S. at 590-91. Hyman and ___ ____ _______ Water Works agree that they had no direct relationship. Hyman argues further that Water Works did not have a direct contractual relationship with any of Hyman's subcontractors. Hyman relies upon the undisputed fact that Water Works consistently refused to extend credit to Jackson and regarded Calvesco as its customer. As the district court correctly noted, courts have allowed recovery under the Miller Act by suppliers who furnish materials to a subcontractor "from time to time on open account . . . without formal contract." Noland, 273 ______ F.2d at 919; see also Apache Powder Co. v. Ashton Co., 264 ___ ____ _________________ ___________ F.2d 417, 422-23 (9th Cir. 1959). It is undisputed that Water Works supplied materials to the Project and that Jackson was the demolition, excavation and site work subcontractor on the Post Office Project after September 27, 1994. In addition, Jackson, rather than Calvesco, paid Water Works's first five invoices. This evidence clearly supports the district court's finding of the existence of an open account between Jackson and Water Works. Since Jackson was -20- Hyman's direct subcontractor, the Act's tiering requirements are satisfied. Since we find that the district court correctly allowed Water Works to recover under an open account theory, we need not address the propriety of its alternative holding, which allowed recovery on the basis of quantum meruit. We have carefully considered Hyman's other arguments; none of them persuade us that the district court erred in its determination. Affirmed. ________ -21-